UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARLON DELOATCH, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     NO. 3:08CV1871 (MRK) |
| | : |
| SAMUEL KELSEY, SR. and | : |
| JAMES MOORE, | : |
| | : |
| Defendants. | : |

**RULING AND ORDER**

This case arises out of an accusation by a developmentally-disabled ten-year-old girl ("Vivian") that she was sexually assaulted on ten occasions by her next-door neighbor, Plaintiff Marlon Deloatch. Because the alleged assaults occurred at Mr. Deloatch's house in Manchester, Connecticut (on one occasion) and a church in East Hartford, Connecticut (on nine occasions), both the Manchester Police Department (MPD) and East Hartford Police Department (EHPD) opened separate investigations into the allegations. Defendant Samuel Kelsey, Sr. was the officer in charge of the East Hartford investigation, and Defendant James Moore was the officer in charge of the Manchester investigation. Both investigations eventually led to Mr. Deloatch's arrest and prosecution in Connecticut Superior Court. More than two years after he was arrested, the State dropped the prosecution against Mr. Deloatch by entering a *nolle prosequi*.[1]

---

[1] "A nolle prosequi is a unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy. . . . Under Connecticut law, a nolle prosequi terminates the prosecution, but the prosecuting authority is permitted to initiate a new action against the defendant within the statute of limitations. . . . A nolle prosequi may not be entered if the accused objects and demands either a trial or dismissal. . . . Criminal charges that have

1

Mr. Deloatch brings claims for false arrest, malicious prosecution, intentional infliction of emotional distress, deprivation of due process, and negligence against both Defendants. Specifically, Mr. Deloatch alleges that both officers conducted deficient investigations and omitted material information from their arrest warrant affidavits. Defendants now move for summary judgment on the grounds that they had probable cause, or at least arguable probable cause, to arrest Mr. Deloatch. *See* Kelsey's Mot. for Summ. J. [doc. # 48]; Moore's Mot. for Summ. J. [doc. # 58]. The Court held an on-the-record telephonic oral argument on May 14, 2010, during which the parties agreed that all of the claims turn on whether Defendants had probable cause.

The Court does not doubt that Mr. Deloatch's arrest, extended imprisonment, and prosecution were a source of great pain and emotional distress to Mr. Deloatch and his family, and that they genuinely believe that Defendants mishandled their investigations to the point of negligence or even maliciousness. Nothing in this decision is meant to demean their pain in any way. But this case is not about whether Mr. Deloatch suffered – which he undoubtedly did – but whether Defendants had probable cause to arrest him. Because the Court concludes that they did, Defendants' Motions for Summary Judgment [docs. ## 48, 58] are GRANTED.

A final word of caution is in order. For purposes of this opinion, the Court need not, and does not, take a position on whether these alleged assaults actually occurred. The Court refers to the "facts" surrounding these assaults throughout this ruling, and often uses the word "alleged." But even where the Court does not, readers should keep in mind that this case involves unsubstantiated *allegations* of sexual assault and that the prosecution against Mr. Deloatch was nolled by the State.

---

been nolled are erased thirteen months after entry of the nolle prosequi." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (internal quotation marks and citations omitted).

**I.**

The Court assumes the parties' familiarity with the facts of this case, which are largely undisputed with a few important exceptions. On March 14, 2006, Vivian reported to her sister and mother that she had been sexually abused by Mr. Deloatch ten times since the summer of 2005 – once at Mr. Deloatch's home in Manchester and nine times at a church in East Hartford that both attended (Mr. Deloatch and his family took Vivian to church twice a week). That same evening, Officer Forish of the MPD interviewed Vivian and her mother. During that interview, Vivian told the same story. Officer Forish also asked her whether she knew whether Mr. Deloatch touched any other girls, and she named Mr. Deloatch's five daughters. This information was included in Officer Forish's report.

The next day, March 15, the case was assigned to Officer Moore. He conducted an initial interview on March 16, and contacted St. Francis Hospital Children's Center ("St. Francis") to schedule a diagnostic interview and exam. That interview occurred on March 21, and Vivian's account remained consistent. The interviewer at St. Francis, Lisa Murphy-Cipolla, contacted Officer Kelsey regarding the abuse that allegedly occurred at the church in East Hartford. Officer Kelsey also received a similar report from DCF investigator Terry Watkins, and he obtained sworn written statements from Vivian's mother and sister. From this point forward, there were two separate investigations – one in Manchester led by Officer Moore and one in East Hartford led by Officer Kelsey.

On March 23, Ms. Watkins interviewed two of Mr. Deloatch's daughters. During that interview, they informed Ms. Watkins that Vivian had spent the night at their house (where they lived with their father) on two occasions during the previous year. On that same day, Officer Kelsey

contacted Mr. Deloatch, who denied the allegations and provided a written statement.  After some initial reluctance, Mr. Deloatch also agreed to take a polygraph exam.  The exam, which Mr. Deloatch took several days later, could not be completed because, according to the detective administering the exam,[2] it was "obvious" that Mr. Deloatch was deliberately using techniques such as abnormal breathing to attempt to thwart the polygraph.  *See* Kelsey's Mot. for Summ. J. [doc. # 48] Ex. F.

Also on March 23, Officer Kelsey visited the church where the alleged abuse occurred and spoke to the minister there, Pastor Lindsay Thompson.  This conversation is the source of one of the major factual disputes in this case.  Mr. Deloatch contends that Pastor Thompson told Officer Kelsey that it was impossible that the alleged abuse could have happened in the church, as he and/or one or more of the parishioners would have seen Mr. Deloatch take Vivian to the bathroom, where the alleged assault occurred.  Officer Kelsey agrees that the conversation took place, but maintains that Pastor Thompson never communicated this particular information to him.  For the purposes of deciding the pending motions, the Court adopts Mr. Deloatch's version of events, as it must.

On March 29, Dr. Nina Livingston, a sexual abuse specialist at St. Francis, conducted a medical exam of Vivian, in which she concluded that Vivian "has a notch in her posterior hymen.  This is an indeterminate finding that supports her disclosure, but is not diagnostic of penetration."  *See* Moore's Mot. for Summ. J. [doc. # 58] Ex. 1 at 39.

Several days later, on April 3, Officer Moore first contacted Mr. Deloatch.  Again, Mr. Deloatch denied the allegations and provided a written statement.  In his statement to Officer Moore,

---

[2] The polygraph exam was administered by Detective William Wesche, a member of the Enfield Police Department and a certified forensic psychophysiologist.

Mr. Deloatch claimed that Vivian had not slept at his house since 2004. He later called to correct the statement, claiming that she had not spent the night since 2002. Officer Moore was aware that Mr. Deloatch's daughters had told Ms. Watkins that Vivian had actually slept at Mr. Deloatch's house twice in the past year. Mr. Deloatch agreed to take another polygraph exam, this one administered by the MPD, which he failed.

On April 5, Detective Kelsey interviewed Vivian in person, with the assistance of her teachers and a social worker. Vivian repeated the allegations against Mr. Deloatch and her story remained consistent. On April 11, Officer Kelsey submitted his application for an arrest warrant, including his arrest warrant affidavit, to the Connecticut Superior Court. The court authorized the warrant on April 18 and Mr. Deloatch was arrested on the East Hartford charges on April 25. The court imposed bail of $200,000. Office Moore completed the Manchester arrest warrant application on May 1, it was authorized by the court on May 4, and was executed shortly thereafter during a hearing on the East Hartford charges. Mr. Deloatch was incarcerated until December 2006, when his bail amount was reduced and he was able to post bond. As previously mentioned, the charges were nolled on May 28, 2008.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The

substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id*. In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

Defendants' argument for summary judgment is simple – they had probable cause for Mr. Deloatch's arrest, which bars all of his claims. During oral argument, Mr. Deloatch's counsel agreed that the existence of probable cause would dispose of all of his claims. He also agreed that the arrest warrant affidavits, on their face, support a finding of probable cause. Nonetheless, he maintained that Defendants did not in fact have probable cause in this case. Specifically, Mr. Deloatch argues that Officer Kelsey did not have probable cause for his arrest for four reasons: (1) Pastor Thompson told Officer Kelsey that it was impossible that the alleged abuse could have occurred at the church,

which he failed to include in his arrest warrant affidavit; (2) Officer Kelsey failed to interview any of the church parishioners to determine if they saw anything; (3) he failed to include the results of the medical exam in his affidavit; and (4) in the affidavit, he erroneously stated that Plaintiff "failed" the polygraph exam.  Mr. Deloatch also claims that Officer Moore lacked probable cause because he never followed up on Vivian's allegation that Mr. Deloatch had touched his daughters, which he says called her veracity into question.

Because there is no evidence that Officer Kelsey was aware of Officer Forish's report regarding Vivian's allegation that Mr. Deloatch touched his own daughters, this information cannot be considered when determining whether Officer Kelsey had probable cause.  Similarly, because Officer Moore was not involved in the investigation of the allegations at the church in East Hartford, and there is no evidence that he was aware of any of the details of that investigation, Officer Kelsey's interview of Pastor Thompson and failure to interview any of the parishioners cannot be considered when determining whether Officer Moore had probable cause.  As discussed below, the Court concludes that none of Mr. Deloatch's allegations of shortcomings in Defendants' investigations destroyed the existence of probable cause to arrest Mr. Deloatch.

**A.**

"'[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  *Jenkins v. City of New York*, 478 F.3d 76, 84-85 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (alteration in original); *see generally Frey v. Maloney*, 476 F. Supp. 2d 141 (D. Conn. 2007).  Federal courts evaluate probable cause in light of the totality of the

7

circumstances. *Jenkins*, 478 F.2d at 90-91. Likewise, under Connecticut law, probable cause "comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal activity has occurred." *State v. Barton*, 219 Conn. 529, 548 (1991) (quoting *Stone v. Stevens*, 12 Conn. 219, 230 (1837)); *see also State v. Heinz*, 193 Conn. 612, 617 (1984) (defining probable cause as a standard "less demanding than that which attends an inquiry into whether there has been a prima facie showing of criminal activity. Instead, all that is required is that the affidavit, read in a common-sense manner, give objective evidence of a fair probability that proscribed activity has occurred." (citations omitted)).

"An arrest pursuant to a warrant signed by a neutral judge or magistrate normally carries a presumption that it was made with probable cause." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 450 (D. Conn. 2002). "[A] plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). A plaintiff can carry this burden if he can demonstrate that a defendant "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (internal quotation marks and citations omitted). This determination is a mixed question of law and fact, and "implicates what, in [the Second Circuit], has come to be known as the 'corrected affidavits doctrine.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Under this doctrine, the Court must construct what a hypothetical, "corrected" warrant application would contain, based on the facts as they were known to the applicant, and must decide whether this corrected affidavit would support probable cause to arrest. *See Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999). In so doing, the Court also must "put aside

allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (quoting *Soares*, 8 F.3d at 920). If the hypothetical corrected warrant application would also objectively support probable cause, "no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." *Soares*, 8 F.3d at 920; *Frey*, 476 F. Supp. 2d at 151.

Mr. Deloatch's argument rests not only on claims that Defendants omitted material information from their arrest warrant affidavits, but also on his allegations that Defendants failed to go far enough in their investigations. "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.'" *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (citation and quotation marks omitted); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity.") (citations omitted); *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[P]olice officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed.").

The Second Circuit does not impose a general duty to investigate all potentially-exculpatory evidence. *See Walczyk v. Rio*, 496 F.3d 139, 160 (2d Cir. 2007) ("[W]e have specifically ruled that a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (internal quotation marks and citation omitted)); *see also Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006); *Jocks v. Tavernier*, 316 F.3d 128, 135-36

(2d Cir. 2003). However, it is also the case that "under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause," *Jocks*, 316 F.3d at 135, and "an officer may not disregard plainly exculpatory evidence, *Panetta*, 460 F.3d at 395. *Cf. BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("Reasonable avenues of investigation must be pursued [to establish probable cause]." (cited approvingly in *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994)).

**B.**

As previously mentioned, Mr. Deloatch does not dispute that the affidavits as written provided probable cause. Nor is there any serious doubt that Vivian's repeated and consistent statements alone provided Defendants with probable cause for Mr. Deloatch's arrest, absent evidence calling her veracity into question. The existence of probable cause was also buttressed by Mr. Deloatch's performance on the polygraph exams; the evidence that Vivian did spend the night at Mr. Deloatch's house in 2005, despite his statement to the contrary; and possibly her medical exam. Therefore, Mr. Deloatch's claims against Defendants rest on alleged omissions in the arrest warrant affidavits and alleged failures to investigate potentially exculpatory avenues.

The Court begins with the alleged omissions by Officer Kelsey, the most significant of which is Pastor Thompson's statement that it was impossible for the alleged abuse to have occurred at the church. *See* Pl.'s Mem. of Law in Opp'n to Def. Kelsey's Mot. for Summ. J. [doc. # 63] ("Pl.'s Resp. Kelsey") at 3-4. Again, Officer Kelsey denies that this was ever communicated to him, but for the purposes of summary judgment the Court assumes that Mr. Deloatch's account is accurate. However, even making this assumption, it is clear from the deposition of Pastor Thompson that he did not tell Officer Kelsey that it was *impossible* for the abuse to have occurred at the church –

instead, he said that it would have been very difficult for Mr. Deloatch to have taken Vivian to the bathroom *during the service* without he or a parishioner noticing. *See* Thompson Dep. [doc. # 90-1]. Pastor Thompson also explained that there was unstructured time before and after the service. *See id*. at 77-79. Finally, Pastor Thompson said that at the time he spoke to Officer Kelsey, he was not aware of how or when the alleged abuse had taken place. *See id*. at 65.

Therefore, it is difficult to see how Pastor Thompson would have been in a position to say that it was impossible for the alleged abuse to have occurred at the church. It may have been impossible during the course of the service for Mr. Deloatch get up and then to escort Vivian to the bathroom, but it theoretically could have happened at some point before or after the service. For this reason, applying the corrected affidavit doctrine, the Court concludes that even had Officer Kelsey included Pastor Thompson's statements (as revealed during his deposition) in his affidavit, there still would have been probable cause for Mr. Deloatch's arrest.

Officer Kelsey's other alleged falsifications of the affidavit – describing the polygraph as "failed" and omitting the results of the medical exam – are unhelpful to Mr. Deloatch. Whether the affidavit said that Mr. Deloatch "failed" the MPD polygraph exam or, as Mr. Deloatch would have it, that the results indicated deception on his part, makes no difference to the probable cause finding.[3] And although Mr. Deloatch is correct that Officer Kelsey did not mention the medical exam in his affidavit, this omission was arguably to Mr. Deloatch's benefit. The results of the medical exam, and specifically Dr. Livingston's conclusion that the findings "support[] [Vivian's] disclosure," *see* Moore's Mot. for Summ. J. [doc. # 58] Ex. 1 at 39, do more to generate probable cause than to

---

[3] As for the East Hartford polygraph exam, Officer Kelsey's affidavit accurately reports the conclusion of the administering detective that Mr. Deloatch attempted to thwart the test.

undermine it. Again, the Court concludes that a corrected affidavit incorporating these omissions would have supported probable cause.

Finally, the Court turns to Mr. Deloatch's argument that Officer Kelsey failed to investigate potentially exculpatory evidence – specifically, that he should have interviewed parishioners at the church. As previously discussed, the Second Circuit does not impose a duty on an officer to investigate potential exculpatory evidence unless he is confronted with evidence that is "plainly exculpatory." *Panetta*, 460 F.3d at 395; *see also Gleis v. Buehler*, No. 09-4466-cv, 2010 WL 1647446, at *2 (2d Cir. Apr. 26, 2010) (summary order) ("The contents of the surveillance tapes, as described by Gleis's fax, were not 'plainly exculpatory evidence' known to the Defendants at the time of the arrest."). *Gleis*, a recently-decided Second Circuit case, is instructive. There, despite the plaintiff's urging, the defendant police officer failed to view surveillance tapes that the plaintiff claimed would have exonerated her. The Second Circuit held that this failure did not destroy probable cause.

In this case, Mr. Deloatch argues that Officer Kelsey should have interviewed other parishioners. But unlike in *Gleis*, there is no evidence that Mr. Deloatch, Pastor Thompson, or anyone else suggested to Officer Kelsey that he should speak to a particular parishioner, or *any* parishioner for that matter; or that a parishioner might be able to offer exculpatory evidence. Indeed, given the nature of the charges, one can imagine that Mr. Deloatch might have preferred Officer Kelsey to be discreet in his investigation. Mr. Deloatch also admits that he does not know what the parishioners would have said. *See* Pl.'s Resp. Kelsey [doc. # 63] at 6 ("An interview with church members would, in all probability, either disclosed information that plaintiff Deloatch was seen with the alleged victim in the bathroom, going to the bathroom, or that he was not seen with the victim

in the bathroom, or going to the bathroom, or coming from the bathroom. Either way, the information potentially was vital to the investigation and it is obvious Defendant Kelsey had no interest in obtaining said information."). At best (for Mr. Deloatch), interviews with parishioners might have revealed that no one ever saw Mr. Deloatch take Vivian to the bathroom; but even this would not necessarily have been exculpatory, as one who committed the acts alleged likely would have been careful to ensure that no one was watching.

Certainly, Officer Kelsey was not confronted with the type of "plainly exculpatory" evidence that would have required him to conduct a further investigation, nor even the type of potentially exculpatory evidence in *Gleis*, which the Second Circuit held did *not* require further investigation. Quite simply, Officer Kelsey had probable cause for Mr. Deloatch's arrest, and he "was under no obligation to continue his investigation in order to gather additional evidence that 'might have cast doubt upon the basis for the arrest.'" *Frey*, 476 F. Supp. 2d at 154 (quoting *Curley*, 268 F.3d at 70).

## C.

Mr. Deloatch's case against Officer Moore rests on Vivian's claim that Mr. Deloatch touched his daughters, which Mr. Deloatch contends should have raised red flags as to her reliability. Although Vivian made this statement during her initial interview with Officer Forish, there is no dispute that Officer Moore was aware of Vivian's claim. "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent circumstances that raise doubts as to the victim's veracity*." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (emphasis added). Vivian did not provide a signed statement in this case (nor would it have been reasonable for Officer Moore to have required one given her age and developmental status), but she

did consistently tell the same story on multiple occasions to different people. The question is whether her claim about Mr. Deloatch's daughters should have led Officer Moore to disbelieve her nonetheless.

The Court concludes that Officer Moore was justified in believing Vivian despite her claim that Mr. Deloatch touched his daughters. This allegation was made only once, in an interview that occurred immediately after the case was brought to the attention of the MPD – it was never raised again by Vivian or anyone else. It is clear that Officer Moore thought it was irrelevant to Vivian's claims against Mr. Deloatch. Even assuming that Vivian's report was false in this respect, this would not necessarily undermine her veracity in regards to her own abuse, which she is obviously more likely to know about. *See Escalera*, 361 F.3d at 745 ("The actual accuracy or veracity of this statement is irrelevant to a determination of whether Lunn had arguable probable cause. Rather, the question is whether Lunn could have reasonably relied on it."); *id*. at 746 ("[W]e assume that Lunn knew that Gonzalez might not be a reliable witness. However, knowledge of a victim witness's criminal or psychiatric history, alone, is not enough to destroy probable cause or strip officers of qualified immunity on the basis of arguable probable cause."). When weighed against all of the evidence supporting Vivian's account – the consistency with which she repeated her story to different individuals, the opinions of the professionals who spoke with her, Mr. Deloatch's performance on the polygraph exam, his apparently inaccurate statement that she had not spent the night at his house since 2002 or 2004 – her lone statement that Mr. Deloatch touched his daughters is simply insufficient to undermine her veracity to the point that Officer Moore no longer had probable cause. Nor would the outcome have been different if Officer Moore had included this information in his affidavit.

## IV.

While Defendants' investigations might not have been perfect, they were sufficient under the circumstances. Defendants spoke to Vivian's family members and Vivian herself. They had her examined by a physician and experts in sexual abuse. Officer Kelsey spoke to the minister of the church where the abuse allegedly occurred. Throughout the entire investigation Vivian's story remained consistent, and there is no indication that any of the professionals who examined her doubted her account. If anyone's veracity was called into question it was that of Mr. Deloatch, who failed one polygraph exam and allegedly tried to thwart another, and who gave inaccurate information in his statement to Officer Moore about when Vivian had last stayed at his home overnight.[4]  Given all of the information available to Defendants, the Court has little trouble concluding that they had probable cause for Mr. Deloatch's arrest.[5]

---

[4] The Court takes no position on the accuracy or reliability of polygraph exams, or whether Mr. Deloatch did in fact attempt to thwart the exam. The Court only describes, as a factual matter, the information available to Defendants at the time.

[5] Even if Defendants did not have probable cause for Mr. Deloatch's arrest, they almost certainly had *arguable* probable cause entitling them to qualified immunity.

> [E]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."

*Escalera*, 361 F.3d at 743 (quoting *Golino*, 950 F.2d at 870). "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest." *Id*. Although the Court believes that Defendants have easily satisfied this test, because it concludes that Defendants had probable cause, it need not decide this issue. The Court also notes that a finding of qualified immunity would apply only to Mr. Deloatch's federal claims.

To his credit, Mr. Deloatch's counsel conceded (correctly) at oral argument that the existence of probable cause would bar all of his client's claims. Because the Court concludes that both Defendants had probable cause for Mr. Deloatch's arrest, their Motions for Summary Judgment [docs. ## 48, 58] are GRANTED. The Court also DENIES as moot Officer Moore's Motion for Judgment on the Pleadings [doc. # 57], as the Court is able to resolve this case on the merits. **The Clerk is directed to enter judgment for Defendants and close this case.**

IT IS SO ORDERED.

/s/     Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: **May 18, 2010**.